1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| TECHNOLOGY CREDIT CORPORATION,<br><br>        Plaintiff,<br><br>    v.<br><br>N. J. CHRISTIAN ACADEMY, INC., et al.,<br><br>        Defendants. | Case No. 5:17-cv-06130-HRL<br><br>**ORDER (1) DENYING DEFENDANTS' MOTION TO DISMISS; AND (2) DENYING DEFENDANTS' MOTION TO TRANSFER VENUE**<br><br>Re: Dkt. No. 11 |

Plaintiff Technology Credit Corporation (TCC) sues for alleged breach of written contract over funding it provided for a failed solar project. Jurisdiction is based on diversity, 28 U.S.C. § 1332. Briefly stated, TCC says that it advanced certain funds for a solar equipment installation at defendants' facilities, but claims that defendants have not re-paid those sums as required by the parties' contracts. Arguing that venue is not proper here, defendants N.J. Christian Academy, Inc. (NJCA or Church) and New Jersey United Christian Academy (NJUCA or School) now ask that the court either dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(3), or transfer this action to the District of New Jersey pursuant to 28 U.S.C. § 1406(a). Even if venue is proper here, defendants alternatively request that this action be transferred to the District of New Jersey pursuant to 28 U.S.C. § 1404(a) for the convenience of the parties and witnesses and in the interest of justice. TCC opposes the motion, contending that the court should enforce a forum selection

clause designating venue in California. Following the motion hearing, and with leave of court, each side submitted supplemental briefing on the issue whether the subject forum selection clause is permissive or mandatory. The matter now being submitted, upon consideration of the moving and responding papers, as well as the arguments of counsel, this court denies the motion to dismiss and the request for a § 1406(a) transfer, as well as the alternate motion to transfer pursuant to § 1404(a).[1]

## BACKGROUND

TCC is headquartered in San Jose, California and says that it is in the business of funding solar equipment installations for non-profit schools, churches, and other non-profit organizations throughout the United States. (Dkt. 22-2, Declaration of James E. Hartigan (Hartigan Decl.) ¶ 2).

Defendant NJCA is a church that offers religious worship and seminars. (Dkt. 11-1, Declaration of Jeong Ha Shinn (Shinn Decl.), ¶ 4). Defendant NJUCA is a boarding school for grades 6-12 that combines academic and religious teachings. (Id.). Both defendants say that they are incorporated in New Jersey and operate only in that state on the same 43-acre retreat facility. (Id.).

According to defendants, in August 2015, a company identifying itself as Green Life Solar, Inc. (Green Life Solar) sent them an email offering to build a solar system on defendants' property. The email described Green Life Solar as "a Solar Integrator and Financing Company" that could build a solar system for defendants "without any upfront cost to the Church . . .." (Shinn Decl. ¶ 7, Ex. A). Among other things, the email stated that "Green Life Solar will coordinate the financing process with its funding partner, as well as[] design, build and install the solar system." (Id.).[2] The Church says that, excited by the prospect of saving money without any

---

[1] All parties have expressly consented that all proceedings in this matter may be heard and finally adjudicated by the undersigned. 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

[2] TCC objects to the statement in Green Life Solar's email suggesting that TCC was Green Life Solar's "funding partner," arguing that it is irrelevant and hearsay. (Shinn Decl., Ex. A). Plaintiff denies being "in a partnership or joint venture with [Green Life Solar]." (Hartigan Decl. ¶ 10). TCC's objections are overruled. Based on the record presented, one may reasonably infer some sort of relationship between TCC and Green Life Solar. The court considers Green Life Solar's assertion, not for the truth of the statement that plaintiff is, in fact, Green Life Solar's "funding partner," but simply as the way in which Green Life's Solar chose to characterize its relationship

upfront cost, it decided to have Green Life Solar construct a solar power system at their facilities and to proceed with Green Life Solar's financing offer.  (Id. ¶ 10).

On September 22, 2015, TCC received an email from Chris Tzokas of Green Life Solar, with a Request for Financing on behalf of NJCA.  (Hartigan Decl. ¶ 3).  TCC says that, on September 24, 2015, it emailed Green Life Solar a proposal in connection with the NJCA project, conditioned on TCC's credit approval of the Church and the School (as the Church's guarantor), as well as on TCC's approval of the equipment to be used on the solar project.  (Id. ¶ 4).  A revised proposal was sent to Green Life Solar on October 28, 2015.  (Id.).

According to TCC, after conducting a thorough credit check on the defendants, it approved the terms of the proposed transaction.  And, TCC's credit committee authorized Daniel Ambrogio (the company's Director of Operations) to prepare a Power Purchase Agreement, supporting documentation, and Guaranty.  (Hartigan Decl. ¶ 5).

There were several agreements executed in connection with the project:

**Installation Contract between Green Life Solar and the Church**

On October 27, 2015, Green Life Solar executed a Solar Construction Agreement (or, what is referred to in the papers as the "Installation Contract") with the Church for the construction of the solar energy system at defendants' New Jersey facilities.  (Shinn Decl. ¶ 8, Ex. B).  The next day, the Church executed the agreement through David Kim, its Facility Administrator at that time.  (Id.).  The Installation Contract contains a forum selection clause designating New Jersey:

> Disputes; Jurisdiction; Venue:  This Agreement shall be governed by the laws of the State of New Jersey.  All disputes hereunder shall be adjudicated in the Superior Court of the State of New Jersey, Camden County Vicinage, unless the parties otherwise agree in writing to pursue alternative dispute resolution.

(Id., Installation Contract ¶ 12).

The first page of the Installation Contract states that the contract "includes:  this page; the Terms, Conditions and Specifications; the State Addendum; Customer Pre-Installation Activities

---

with TCC.  Nevertheless, the court agrees that Dr. Shinn's assertion (Shinn Decl. ¶¶ 7, 10) that defendants were told that TCC was Green Life Solar's funding partner is hearsay and lacks foundation.  Fed. R. Evid. 602, 803.

(if applicable) and any other documents expressly made a part of this Agreement." (Shin Decl. ¶ 8, Ex. B, Installation Contract at 1). It further provides that the "Agreement represents the entire agreement between [Church] and [Green Life Solar] and supersedes all prior negotiations, representation[s] or agreements, either written or oral." (Id.). However, appended to the Installation Contract are several exhibits, most of which, on their face, indicate that they are part and parcel of, or supplements to, the Power Purchase Agreement between TCC and the Church. The Installation Contract also says that the Church's obligations under the contract are conditioned on "[Church]'s successful negotiation of a financing agreement and power purchase agreement (the "Financing and Power Purchase Agreement") with [TCC] . . . ." (Id.). Thus, if the Church didn't manage to obtain such financing on terms reasonably acceptable to the Church, then the Church could terminate the Installation Contract. (Id.).

### Power Purchase Agreement between TCC and the Church

The Church subsequently entered into the Power Purchase Agreement with TCC. (Shinn Decl., ¶ 10, Ex. C). According to TCC, through the Power Purchase Agreement, the Church contracted with TCC to have TCC buy the solar energy system from Green Life Solar and to then sell the power from that system to the Church. (Id.). The Power Purchase Agreement contains a forum selection clause that provides:

> **Governing Law**. This Agreement shall be governed by and construed in accordance with the internal laws, but not the choice of laws provisions, of the State of California, without giving effect to conflicts of laws principles. ***[TCC] and [Church] hereby submit to the non-exclusive jurisdiction of any State or Federal court located in San Jose, California for all legal proceedings arising directly or indirectly from this Agreement, and each irrevocably waives any objection to any such proceeding based on venue or inconvenient forum***. The Parties agree to waive their right to a jury trial and to submit all disputes of fact or law relating to or arising out of this Agreement to a trial pursuant to an Order of Reference under California Code of Civil Procedure section 638 et seq. The Parties intend this general reference agreement to be specifically enforceable in accordance with CCP section 638 et seq.

(Id. Power Purchase Agreement ¶ 22) (emphasis added). The Power Purchase Agreement also states that "[t]his Agreement (including all exhibits attached hereto represents the entire agreement between the Parties with respect to the subject matter of this Agreement and supersedes all prior

and contemporaneous oral and written agreements." (Id. Power Purchase Agreement ¶ 13).

Dr. Jeong Ha Shinn, NJCA's founder, Chairman and Director of the Board, executed the Power Purchase Agreement on December 15, 2015. (Shinn Decl. ¶ 10, Ex. C). James E. Hartigan, TCC's co-founder, executed the agreement on behalf of TCC. However, TCC says that it did not receive defendants' signed agreement until December 21, 2015; and, although his signature is dated December 15, 2015, Hartigan says that the agreement, as executed by defendants, was not actually presented to him for signature until sometime after December 21, 2015. (Dkt. 22-3, Declaration of Daniel Ambrogio (Ambrogio Decl.) ¶ 5; Hartigan Decl. ¶ 9).

## Progress Payment Agreement between TCC and the Church

As discussed, the Installation Contract between the Church and Green Life Solar appends several exhibits that indicate that they are part of, or supplements to, the Power Purchase Agreement between TCC and the Church. Relevant to the discussion here, appended as Exhibit G to the Installation Contract is a document entitled "Progress Payment Agreement." In relevant part, the Progress Payment Agreement provides that:

> … on or before June 10, 2016 (the "Commitment Termination Date"), at the request of [Church], [TCC] shall fund the purchase of System by making payments toward the purchase price of such System as designated by [Church] as specified in one or more draw requests provided by [Church] to [TCC] from time to time (the "Progress Payments"). The aggregate amount of Progress Payments paid by [TCC] hereunder shall not exceed a total of Six Hundred Thousand Three Hundred Twenty-seven Dollars and Zero Cents ($600,327.00) (the "Commitment").

(Id. ¶ 2(a)). The agreement further provides that the Church "shall request that [TCC] make a Progress Payment by delivering a notice, in the form of attached Schedule B, (a "Funding Request") to [TCC]" that (1) identifies the amount of the Progress Payment, which together with all other Progress Payments previously made by TCC, does not exceed the Commitment; (2) identifies the date by which the Progress Payment is to be made; and (3) appends an invoice from Green Life Solar for the amount of the Progress Payment. (Id. ¶ 2(b)). "Delivery of such Funding Request shall constitute an acknowledgement by [Church] that such invoice is approved and accepted by [Church]." (Id.).

TCC's obligation to make Progress Payments was to terminate on the "Termination Date,"

i.e., the earlier of (1) the "Operational Commencement Date" under the Installation Contract (essentially, the date the Church certified to TCC that the solar energy system was successfully installed and operational) or (2) the Commitment Termination Date. (Shinn Decl., ¶ 8, Ex. B Progress Payment Agreement ¶ 3(b)). And, on the Termination Date, the Progress Payment Agreement provides that "[Church] shall pay to [TCC] an amount equal to the aggregate amount of all Progress Payments made by [TCC] hereunder together with the Interest Amount due and payable . . .." (Id. ¶ 4(b)).

Dr. Shinn signed the Progress Payment Agreement for NJCA on December 15, 2015, and Hartigan executed the document for TCC. (Shinn Decl., Ex. B). Again, Hartigan avers that although his signature is dated December 15, 2015, the document as executed by defendants, was not presented to him for signature until sometime after December 21, 2015. (Ambrogio Decl. ¶ 5; Hartigan Decl. ¶ 9).

### Guaranty between TCC and the School

Finally, through a Guaranty, TCC says that the School guaranteed the Church's debt/loan obligations. Dr. Shinn executed the Guaranty for the School on December 15, 2015. (Shinn Decl., ¶ 12, Ex. D; Hartigan Decl. ¶ 9). The Guaranty contains a "Miscellaneous" section that provides, in relevant part:

> This Guaranty shall be governed by and construed according to the laws of the State of California, shall be binding upon the heirs, executors, administrators, successors, and assigns of the Guarantor [School] and shall inure to the benefit of the Power Supplier [TCC], its successors and assigns.

(Shinn Decl., Ex. D).

### Subsequent Events

As discussed above, under the Progress Payment Agreement, TCC and the Church agreed to a Commitment Termination Date of June 10, 2016. Through a subsequent amendment dated June 27, 2016, the Commitment Termination Date was extended to September 30, 2016. (Shinn Decl., Ex. B).

It is undisputed that, for whatever reason, Green Life Solar never did construct the solar power system at defendants' facilities. Defendants say that from February through June 2016,

they received several emails from Green Life Solar, citing various reasons for delays, including (1) pending approval from New Jersey's Clean Energy Program; (2) delays from "the electric company"; and (3) a "township permit delay." (Shinn Decl. ¶ 15, Exs. E-G).

Meanwhile, the Church says it received two invoices from Green Life Solar---the first on December 15, 2015 for $100,054.00, and the second on June 26, 2016 for $308,277.00. (Shinn Decl., ¶¶ 19-20, Exs. K-L).[3] TCC says in response to two funding requests it received from the Church, TCC directed Bank of the West to make the requested wire transfers to Green Life Solar. Specifically, plaintiff says that its records show that (1) on January 19, 2016, a wire transfer was made from TCC's Bank of the West account to Green Life Solar in the amount of $100,054.00; and (2) a second wire transfer in the amount of $308,277.00 was made to Green Life Solar on June 29, 2016---for a total of $408,331.00. (Hartigan Decl., ¶ 11).

In July 2016, the Church terminated David Kim, the Facility Administrator who executed the Installation Contract and who, defendants say, had been the only person communicating with Green Life Solar up to that time. Thereafter, NJCA/NJUCA employee, Adam Kim, began to oversee the Installation Contract. He says he made multiple attempts to reach Green Life Solar by email and phone, but was unable to reach anyone, including David Wei and Chris Tzokas, who reportedly communicated with David Kim about the solar project. (Dkt. 11-3, Declaration of Adam Kim (Kim Decl.) ¶ 4).

TCC says that, by late November 2016, it appeared that Green Life Solar was never going to construct the solar system at the NJCA site. (Hartigan Decl. ¶ 14). And, in December 2016, defendants say that they began receiving communications from TCC to "work on a solution" to the issues. (Shinn Decl. ¶ 18, Exs. I & J). By February and April 2017, defendants say that those communications became formal demands for "repayment of amounts loaned to NJCA by TCC." (Shinn Decl. ¶¶ 21-23, Ex. M-O).

In May 2017, Dr. Shinn and Adam Kim say they met with an attorney to discuss opening a fraud investigation into Green Life Solar's conduct. (Shinn Decl., ¶¶ 24-25, Ex. P; Kim Decl. ¶¶

_____

[3] Although the copy of the second invoice submitted by defendants does not show any dollar figure, there is no dispute as to the amount that was invoiced.

7-8). That attorney asked the Monmouth County, New Jersey prosecutor to investigate the matter, and defendants say that the prosecutor's investigation is still pending. (Shinn Decl. ¶ 25, Ex. P; Kim Decl. ¶ 8).

Shortly after, TCC wrote defendants to advise that it had retained counsel to pursue collection of the amounts TCC claims they owe. (Shinn Decl. ¶ 26, Ex. Q). This lawsuit followed. In its complaint, TCC says that as a result of defendants' (alleged) breach of contract, TCC has been damaged in a sum exceeding $470,939.46.

Defendants contend that this matter doesn't belong here and should proceed in New Jersey in any event. For the reasons to be discussed, this court denies the Fed. R. Civ. P. 12(b)(3) motion to dismiss, as well as the alternate motion to transfer pursuant to 28 U.S.C. § 1404(a).

## DISCUSSION

## I.     FED. R. CIV. P. 12(b)(3) MOTION TO DISMISS

A venue challenge may be raised by motion under Federal Rule of Civil Procedure 12(b)(3). In such a motion, "pleadings need not be accepted as true, and facts outside the pleadings may be considered." Doe 1 v. AOL LLC, 552 F.3d 1077, 1081 (9th Cir. 2009). Rule 12(b)(3) "allow[s] dismissal only when venue is 'wrong' or 'improper.'" Atlantic Marine Constr. Co. v. U.S. Dist. Ct., 134 S. Ct. 568, 577 (2013). "Whether venue is 'wrong' or 'improper' depends exclusively on whether the court in which the case was brought satisfies the requirements of federal venue laws"---and the question whether venue is proper generally is governed by 28 U.S.C. § 1391. Id. Section 1391 provides that venue is proper: (1) in "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located"; (2) in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated"; or (3) "if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action." 28 U.S.C. § 1391(b)(1)-(3). TCC acknowledges that it bears the burden of showing that venue is proper in the Northern District of California. Piedmont Label Co. v. Sun Garden Packing Co., 598 F.2d 491, 496 (9th Cir. 1979).

"When venue is challenged, the court must determine whether the case falls within one of the three categories set out in § 1391(b)." Atlantic Marine, 134 S. Ct. at 577. "If it does, venue is proper; if it does not, venue is improper, and the case must be dismissed or transferred under [28 U.S.C.] § 1406(a)" to any district in which it could have been brought. Id. "Whether the parties entered into a contract containing a forum selection clause has no bearing on whether a case falls into one of the categories of cases listed in § 1391(b)." Id.

Venue in California cannot be based on § 1391(b)(1) since both defendants reside in New Jersey. (As will be discussed more fully below, § 1391(b)(1) does provide a basis for venue in New Jersey. Thus, § 1391(b)(3) does not apply.)

The key dispute is whether a substantial part of the events or property giving rise to TCC's claims occurred in the Northern District of California, thus providing a basis for venue here under § 1391(b)(2). Plaintiff argues that venue is proper under § 1391(b)(2) because its agreements with defendants were made in California and were to be performed here and because, according to the complaint, TCC suffered harm here as a result of defendants' alleged breach of contract. Citing Farm Credit West, PCA v. Lanting, No. 1:13-cv-00712-AWI-SMS, 2013 WL 3730391 (E.D. Cal., July 12, 2013), TCC argues that its contracts with defendants were made in California because Hartigan's execution of those documents was the last act necessary to give them binding effect. Like TCC, in Farm Credit West, the California plaintiff sued for breach of a guaranty, and the Washington state defendant moved for a more definite statement, arguing that the complaint's allegations were too vague or ambiguous to establish that venue was proper in California. Concluding that the complaint's allegations were sufficient to establish proper venue, the Farm West Credit court noted that "[a] contract is to be performed at the place where it is made, when no other place is indicated"; "[a] contract is 'made' in the place of acceptance"; and "[a]n obligation evidenced by an instrument is created at the place where the instrument is delivered." Id. at *2. The guaranty at issue in Farm Credit West was deemed to be made in California (not Washington) because the defendants executed the guaranty and delivered it to plaintiff; plaintiff signed and accepted the guaranty in California; plaintiff's acceptance was the last act necessary to give the guaranty binding effect; and no place of performance was expressly mentioned in the

9

document.  Id.  TCC argues, persuasively, that the same operative facts are present here.
Additionally, TCC says that the Church's funding requests were processed in San Jose; the bank
that made the wire transfers to Green Life Solar is located in San Jose; TCC is headquartered in
San Jose; and defendants' alleged breach caused TCC to suffer harm here.

For their part, defendants argue that all or most substantial events giving rise to TCC's
claims occurred in New Jersey, noting that at least one court has observed that the "[m]ere
execution of a contract does not weigh heavily in determining which forum state is more
convenient or proper." Vitria Tech., Inc. v. Cincinnati Ins. Co., No. C05-01951 JW, 2005 WL
2431192 at *3 (N.D. Cal., Sept. 30, 2005).  They point out that the Power Purchase Agreement
and Guaranty concerned TCC's agreement to fund the solar construction project at defendants'
New Jersey facilities; TCC's communications with defendants took place with NJCA employees,
all of whom are located in New Jersey; and no meetings between the parties ever took place in
California.  Additionally, defendants note that they signed the subject agreements in New Jersey.
Further, defendants contend that their contracts with TCC essentially are intertwined with their
deal with Green Life Solar.  And, to that end, defendants argue that it is material that the actual
construction of the solar power system was governed by the Installation Contract with Green Life
Solar (a New Jersey corporation), and that the Installation Contract contains a forum selection
clause requiring disputes under that contract to be brought in New Jersey.

Defendants fail to convince.  First, the Installation Contract's forum selection clause is
irrelevant to the court's § 1391 analysis.  Atlantic Marine, 134 S. Ct. at 577.  Second, courts have
held that § 1391 "'does not require that a majority of the events have occurred in the district where
the suit is filed, nor does it require that the events in that district predominate.'" Artec Group, Inc.
v. Klimov, No. 15-cv-03449-RMW, 2015 WL 9304063, at *7 (N.D. Cal., Dec. 22, 2015) (quoting
Rodriguez v. Cal. Highway Patrol, 89 F. Supp.2d 1131, 1136 (N.D. Cal. 2000)).  "Rather, 'for
venue to be proper, significant events or omissions material to the plaintiff's claim must have
occurred in the district in question, even if other material events occurred elsewhere.'" Richmond
Techs., Inc. v. Aumtech Bus. Solutions, No. 11-cv-02460-LHK, 2011 WL 2607158, at *10 (N.D.
Cal., July 1, 2011) (quoting Gulf Ins. Co. v. Glasbrenner, 417 F.3d 353, 357 (2d Cir. 2005)).  And,

in contract disputes, "courts have 'looked to such factors as where the contract was negotiated or executed, where it was to be performed, and where the alleged breach occurred.'" Id. (quoting Gulf Ins. Co., 417 F.3d at 357). Thus, under § 1391, "venue may be proper in multiple districts if a 'substantial part' of the underlying events took place in each of those districts." Id. (citing Gulf Ins. Co., 417 F.3d at 356).

In this case, although defendants signed the subject agreements in New Jersey, TCC accepted and executed those documents here; the Church's funding requests were processed in San Jose; the bank that made the wire transfers to Green Life Solar is located in San Jose; TCC is headquartered in San Jose; and defendants' alleged breach reportedly caused TCC to suffer harm here. And while the parties apparently never met in person here, "courts have recognized that modern technology permits the negotiation and performance of contracts without face-to-face contacts and have found venue proper in a district in which either party to a contract was located." Richmond Techs. Inc., 2011 WL 2607158, at *10; see also Twitter, Inc. v. Skootle Corp., No. C12-1721 SI, 2012 WL 2375486, at *6 (N.D. Cal., June 22, 2012) (concluding that the plaintiff sufficiently alleged proper venue in the Northern District of California where the complaint alleged that the defendant entered into a contract with the plaintiff corporation headquartered in this district and that the plaintiff's business and goodwill suffered harm in this district as a result of defendant's alleged conduct). Accordingly, on the record presented, the court finds that while this suit could have been brought in New Jersey, venue is proper here because it is where "one party to the contract was located and to which obligations under the contract were due, for that location 'is determined at the inception of the contract and therefore parties can anticipate where they may be sued.'" Richmond Techs. Inc., 2011 WL 2607158, at *10 (quoting Decker Coal Co. v. Commonwealth Edison Co., 805 F.2d 834, 842 (9th Cir. 1986)).

Defendants' Fed. R. Civ. P. 12(b)(6) motion to dismiss for improper venue is denied, as is their request for a transfer pursuant to 28 U.S.C. § 1406(a).

## II.    MOTION TO TRANSFER, 28 U.S.C. § 1404(a)

Alternatively, defendants request that this court exercise its discretion to transfer this case to New Jersey pursuant to 28 U.S.C. § 1404(a), which provides:   "For the convenience of parties

and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."

Defendants argue that the relevant factors to be considered under § 1404(a) weigh in favor of transfer. TCC, on the other hand, contends that transfer is precluded by the Power Purchase Agreement's forum selection clause. To recap, that clause provides, in relevant part:

> **Governing Law**. This Agreement shall be governed by and construed in accordance with the internal laws, but not the choice of laws provisions, of the State of California, without giving effect to conflicts of laws principles. *[TCC] and [Church] hereby submit to the non-exclusive jurisdiction of any State or Federal court located in San Jose, California for all legal proceedings arising directly or indirectly from this Agreement, and each irrevocably waives any objection to any such proceeding based on venue or inconvenient forum*. . . .

(Shinn Decl., Ex. C, Power Purchase Agreement ¶ 22). Noting Atlantic Marine's directive that "a valid forum-selection clause [should be] given controlling weight in all but the most exceptional cases," 134 S. Ct. at 581, TCC argues that defendants fail to demonstrate that this is an exceptional case and that the forum selection clause therefore should be given controlling weight.

In response, defendants contend that the forum selection clause is invalid and that Atlantic Marine does not apply. Arguing that the contractual relationship with TCC essentially is an adjunct of the solar power project with Green Life Solar, defendants maintain that the court should consider that the Installation Contract with Green Life Solar contains a forum selection clause designating New Jersey as the place for dispute resolution. (Shinn Decl., Ex. B, Installation Contract ¶ 12).

The present case deviates from the usual situation in which it generally is the defendant who moves to enforce a forum selection clause in order to have a case transferred elsewhere. Here, it is plaintiff TCC who argues that the forum selection clause should be respected in order to prevent the action from being transferred. This, however, has no material effect on the court's analysis. For the reasons to be discussed, the court denies defendants' motion to transfer.

**A.** **Legal Standard**

     **1.** **Traditional § 1404(a) Analysis**

Transfer pursuant to § 1404(a) is appropriate where (1) the transferee court is one where the action might have been brought; and (2) the convenience of the parties and witnesses and the interest of justice favor transfer. 28 U.S.C. § 1404(a); Hatch v. Reliance Ins. Co., 758 F.2d 409, 414 (9th Cir. 1985). The moving party bears the burden of making a strong showing that transfer is warranted. Decker Coal Co., 805 F.2d at 843.

To find that an action could have been brought in the transferee district, "the transferee court must: (1) be able to exercise personal jurisdiction over the defendant, (2) have subject matter jurisdiction over the claim, and (3) be a proper venue." Zimpelman v. Progressive Northern Ins. Co., No. C09-03306 RMW, 2010 WL 135325 at *1 (N.D. Cal., Jan. 8, 2010) (citing Hoffman v. Blaski, 363 U.S. 335, 343-44, 80 S.Ct. 1084, 4 L.Ed.2d 1254 (1960)). A § 1404(a) motion to transfer requires a court to consider a variety of private and public interest factors, such as "(1) the location where the relevant agreements were negotiated and executed, (2) the state that is most familiar with the governing law, (3) the plaintiff's choice of forum, (4) the respective parties' contacts with the forum, (5) the contacts relating to the plaintiff's cause of action in the chosen forum, (6) the differences in the costs of litigation in the two forums, (7) the availability of compulsory process to compel attendance of unwilling non-party witnesses, and (8) the ease of access to sources of proof." Jones v. GNC Franchising, Inc., 211 F.3d 495, 498-99 (9th Cir. 2000). "No single factor is dispositive, and a district court has broad discretion to adjudicate motions for transfer on a case-by-case basis." Ctr. for Biological Diversity v. Kempthorne, No. C08-1339 CW, 2008 WL 4543043 at *2 (N.D. Cal., Oct. 10, 2008).

     **2.** ***Atlantic Marine*'s Impact on the Traditional Analysis**

Under Atlantic Marine, the presence of a valid forum selection clause changes the traditional § 1404(a) analysis in several ways. Relevant to the parties' arguments here is that, under Atlantic Marine's modified analysis, the court does not consider the parties' private interests and deems those factors to weigh entirely in favor of the preselected forum.[4] 134 S. Ct. at 581-82.

---

[4] Atlantic Marine also changed in the traditional analysis by providing that (1) the plaintiff's

Thus, instead of evaluating both private interests of the parties and public interest factors, a court deciding whether to transfer an action when there is a valid forum selection clause must deem that clause to "represent[] the parties' agreement as to the most proper forum" and should give it "controlling weight in all but the most exceptional circumstances." Id. at 581.

**B. Discussion**

**1. Jurisdiction and venue in the District of New Jersey**

Under the first prong of the traditional § 1404(a) analysis, this court concludes that this suit could have been brought in the District of New Jersey. That court undoubtedly has personal jurisdiction over the defendants, and venue would be proper there under 28 U.S.C. § 1391(b)(1). Moreover, TCC's complaint sufficiently alleges complete diversity of citizenship and claims that TCC is owed more than $470,000---well over the $75,000 threshold for diversity jurisdiction under 28 U.S.C. § 1332.

**2. The forum selection clause is valid**

"A contractual forum selection clause is 'prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances.'" Docksider, Ltd. v. Sea Technology, Ltd., 875 F.2d 762, 763 (9th Cir. 1989) (quoting M/S Bremen v. Zapata Offshore Co., 407 U.S. 1, 10, 92 S. Ct. 1907, 1913, 32 L.Ed.2d 513 (1972)). There are three reasons that would make enforcement of a forum selection clause unreasonable: "(1) 'if the inclusion of the clause in the agreement was the product of fraud or overreaching'; (2) 'if the party wishing to repudiate the clause would effectively be deprived of his day in court were the clause enforced'; and (3) 'if enforcement would contravene a strong public policy of the forum in which suit is brought.'" Murphy v. Schneider Nat'l, Inc., 362 F.3d 1133, 1140 (9th Cir. 2004) (quoting Richards v. Lloyd's of London, 135 F.3d 1289, 1294 (9th Cir. 1998)). The party challenging the clause bears a heavy burden of proof. Id. (citing The Bremen, 407 U.S. at 15, 92 S. Ct. 1907).

Defendants do not claim they would be deprived of their day in court if the Power

---

choice of forum merits no weight and (2) the agreed-upon forum need not apply the law of the court where the suit was filed. 134 S. Ct. at 581-82. As noted, however, the situation here is the reverse of that presented in Atlantic Marine, in that it is plaintiff TCC who argues that the forum selection clause prevents this case from being transferred away from this district, its chosen forum.

United States District Court
Northern District of California

Purchase Agreement's forum selection clause is enforced. Instead, they argue that the forum selection clause was the product of overreaching and that its enforcement is contrary to public policy. "Overreaching is generally seen as 'a ground short of fraud.'" Mechanix Wear, Inc. v. Performance Fabrics, Inc., No. 2:16-cv-09152-ODW (SS), 2017 WL 417193, at *5 (C.D. Cal., Jan. 31, 2017) (quoting Murphy, 362 F.3d at 1141). "In evaluating whether an agreement was the product of overreaching, courts have taken into account factors such as the signer's level of education, power differentials between the parties, and circumstances underlying the agreement's signing." Id. "Courts have also stressed the importance of taking into account how the clause is communicated." Id.

Here, defendants say that Dr. Shinn, who signed the Power Purchase Agreement, did not know that the contract contained a "Governing Law" section. And, pointing out that English is not his first language, defendants claim that Dr. Shinn did not understand the legal import of the forum selection clause, which they say TCC never discussed. Having foraged the internet for information, TCC submits evidence it contends shows that Dr. Shinn was not hapless or unwitting, as he would seem to let on. Defendants object to that evidence on numerous grounds, but the court has, in any event, found it unnecessary to consider that evidence. It is defendants' burden to demonstrate overreaching, and they have not met that heavy burden here.

According to his own declaration, Dr. Shinn is the founder of NJCA and the current Chairman and Director of the Board (Shinn Decl. ¶ 3), and the prefix before his name indicates that Dr. Shinn is highly educated. There is no indication that he had insufficient time to review the contracts, or that he sought a translation of the documents or legal consultation. Nor is there any evidence that defendants were prevented from seeking the same due to time pressures or anything else. Defendants seem to suggest that TCC was in a superior bargaining position, arguing that TCC is in the business of financing and is well familiar with the terms of its own agreements. But, defendants have not convincingly demonstrated that there was any unequal bargaining power. In any event, "a forum clause is not unreasonable merely because of the parties' unequal bargaining power: it is enforceable if there is reasonable communication of the clause." Marcotte v. Micros Sys., Inc., No. C14-01372 LB, 2014 WL 4477349, at *7 (N.D. Cal.,

Sept. 11, 2014). In the Power Purchase Agreement, the forum selection clause appears under the bold underlined heading "Governing Law." While defendants seem to suggest that the forum selection clause was buried on the last page of that contract, the clause appears in the middle of the page, just above the signature boxes where the parties executed the agreement. (Shinn Decl. Ex. C). The court finds no overreaching here. See generally, e.g., Mechanix Wear, Inc., 2017 WL 417193 at *5 (finding no overreaching where there was no evidence the defendant was prevented from seeking legal counsel or that there was insufficient time for him to do so, and where the forum selection clause appeared under the bold underlined heading "Governing Law/Forum" in the middle of a 4-page typewritten agreement).

Defendants nonetheless argue that enforcement of the forum selection clause is contrary to public policy. But, they fail to identify any policy that would be violated if the clause were to be enforced. Instead, they merely note the *absence* of any public policy concerns about providing a neutral forum for dispute resolution (a concern that, they say, is present largely in international cases). In any event, to the extent that defendants suggest that the presumptive validity of forum selection clauses applies only in international disputes, they fail to persuade that is consistent with the law.

For the first time in their supplemental brief, defendants argue, in highly conclusory fashion, that the School should not be subject to the forum selection clause because it is not a party to the Power Purchase Agreement between TCC and the Church. Defendants cite no supporting legal authority, and their eleventh-hour argument is beyond the issue for which supplemental briefing was permitted. In any event, defendants fail to persuade. The School entered into the Guaranty, which purports to guarantee the Church's obligations under the Power Purchase Agreement. Moreover, there is an apparent affiliation between the Church and the School and both contracts were signed on their behalf by Dr. Shinn. (Shinn Decl., Exs. B & C). The School fairly is subject to the Power Purchase Agreement's forum selection clause.

Defendants have not met their heavy burden to prove that the forum selection clause was the product of overreaching or that its enforcement is contrary to public policy. The parties nevertheless dispute whether the court is to consider both private and public factors under the

traditional § 1404(a) analysis or whether the modified <u>Atlantic Marine</u> analysis applies.

### 3. *Atlantic Marine* governs the transfer analysis

As previewed above, TCC contends that under <u>Atlantic Marine</u>, the forum selection clause is to be given "controlling weight in all but the most exceptional circumstances," and the court does not consider the parties' private interests (deeming those factors to weigh entirely in favor of the preselected forum) and considers only the public interest factors in its analysis. <u>Id.</u> at 581-82. Many courts (including this one) have concluded that the modified <u>Atlantic Marine</u> *forum non conveniens* analysis applies only to mandatory clauses.[5]

Emphasizing that the forum selection clause says that the parties "submit to the ***non-exclusive*** jurisdiction of any State or Federal court located in San Jose, California," defendants maintain that the forum selection clause is permissive and that the modified <u>Atlantic Marine</u> analysis therefore does not apply. (Shinn Decl., Ex. C, Power Purchase Agreement ¶ 22) (emphasis added). TCC, on the other hand, argues that the clause is mandatory because it contains an "irrevocab[le] waiv[er]" of "any objection to any such proceeding based on venue or inconvenient forum." (<u>Id.</u>).

A permissive clause allows suit to be brought in a particular forum, but does not preclude litigation elsewhere. A mandatory clause, by contrast, "clearly require[s] *exclusive* jurisdiction." <u>Hunt Wesson Foods, Inc. v. Supreme Oil Co.</u>, 817 F.2d 75, 77 (9th Cir. 1987). The determination whether a forum selection clause is mandatory or permissive is a matter of contract interpretation. <u>N. Cal. Dist. Council of Laborers v. Pittsburg-Des Moines Steel Co.</u>, 69 F.3d 1034, 1036 (9th Cir. 1995). The court applies federal law in interpreting forum selection clauses. <u>AOL LLC</u>, 552 F.3d

---

[5] <u>See, e.g.</u>, <u>GDG Acquisitions, LLC v. Government of Belize</u>, 749 F.3d 1024 (11th Cir. 2014) (remanding action, in view of <u>Atlantic Marine</u>, for a determination whether the parties' contract contained a mandatory forum selection clause); <u>RELCO Locomotive, Inc. v. AllRail, Inc.</u>, 4 F. Supp.3d 1073, 1085 (S.D. Iowa 2014) (holding that <u>Atlantic Marine</u> "contemplated only mandatory forum-selection clauses when assessing their effect on *forum non conveniens* analysis" and that the parties' forum selection clause was permissive where the parties agreed to the non-exclusive jurisdiction of a particular forum); <u>Cream v. Northern Leasing Sys., Inc.</u>, No. 15-cv-01208-MEJ, 2015 WL 4606463 at *4 n.2 (N.D. Cal., July 31, 2015) (noting that while <u>Atlantic Marine</u> did not address the permissive versus mandatory distinction, "district courts across the country have generally limited the <u>Atlantic Marine</u> framework to situations where the forum selection clause is mandatory.") (citing cases)).

17

1    at 1081. When interpreting a contract under federal law, courts "look for guidance 'to general

2    principles for interpreting contracts.'" Id. (quoting Klamath Water Users Protective Ass'n v.

3    Patterson, 204 F.3d 1206, 1210 (9th Cir.1999)). "'Contract terms are to be given their ordinary

4    meaning, and when the terms of a contract are clear, the intent of the parties must be ascertained

5    from the contract itself. Whenever possible, the plain language of the contract should be

6    considered first.'" Id. (quoting Klamath Water Users Protective Ass'n, 204 F.3d at 1210). "A

7    primary rule of interpretation is that '[t]he common or normal meaning of language will be given

8    to the words of a contract unless circumstances show that in a particular case a special meaning

9    should be attached to it.'" Hunt Wesson Foods, Inc., 817 F.2d at 77 (quoting 4 S. Williston, A

10    Treatise on the Law of Contracts § 618 (W. Jaeger 3d ed. 1961)). Additionally, the court "read[s]

11    a written contract as a whole, and interpret[s] each part with reference to the whole." AOL LLC,

12    552 F.3d at 1081 (quoting Klamath Water Users Protective Ass'n, 204 F.3d at 1210). "That the

13    parties dispute a contract's meaning does not render the contract ambiguous; a contract is

14    ambiguous 'if reasonable people could find its terms susceptible to more than one interpretation.'"

15    Id. (quoting Klamath Water Users Protective Ass'n, 204 F.3d at 1210).

16       Defendants are correct that clauses simply signifying agreement to jurisdiction in a

17    particular forum are deemed permissive. See, e.g., Hunt Wesson Foods, Inc., 817 F.2d at 77)

18    (concluding that the clause at issue was permissive because it did not indicate that the Orange

19    County courts were the exclusive forum and simply demonstrated that those courts have

20    jurisdiction). Nevertheless, TCC cites a number of cases outside the Ninth Circuit in which courts

21    have held that a clause may be mandatory where, as here, permissive forum selection language is

22    coupled with an express waiver of venue objections. See, e.g., Aguas Lenders Recovery Group v.

23    Suez, 585 F.3d 696, 700 (2d Cir. 2009) (concluding that the combination of a forum selection

24    clause and a waiver of any claims of *forum non conveniens* "amounts to a mandatory forum

25    selection clause at least where the plaintiff chooses the designated forum"); AAR Int'l, Inc. v.

26    Nimelias Enterprises, S.A., 250 F.3d 510, 525-26 (7th Cir. 2001) ("We have held that by agreeing

27    to a mandatory forum selection agreement, a party waives objections to venue in the chosen forum

28    on the basis of cost or inconvenience to itself. It would seem incongruous to conclude that a party

18

does not similarly waive objections when he agrees to a permissive forum selection clause which specifically provides for the waiver of convenience-based objections to suits brought in a particular venue.") (citation omitted); <u>S&L Birchwood, LLC v. LFC Capital, Inc.</u>, 752 F. Supp.2d 280, 285 (E.D.N.Y. 2010) ("As recognized by the Second Circuit in *Aguas Lenders*, the 'combination' of a permissive forum selection clause along with a waiver of an objection to venue, 'amounts to a mandatory forum selection clause at least where the plaintiff chooses the designated forum."); <u>Akers Biosciences, Inc. v. Martin</u>, No. 14-cv-8241 (AJN), 2015 WL 1054971 at *4 (S.D.N.Y., Mar. 10, 2015) ("While it is true that '[f]or a forum selection clause to be deemed mandatory, jurisdiction and venue must be specified with mandatory or exclusive language, it is well recognized that such a clause may nonetheless be mandatory where it 'combines permissive forum selection language with an express waiver of venue objections.'") (citations omitted).

While neither side has cited Ninth Circuit authority directly on point, the court has found several decisions in which district courts in this circuit have reached similar conclusions. At least one has found that the combination of permissive forum selection language and an express waiver of venue objections rendered the identified forum the exclusive one for dispute resolution. <u>See Or-Cal, Inc. v. Tessenderlo Kerley, Inc.</u>, No. 6:14-cv-01074-AA, 2014 WL 12646028 at *2 (D. Or., Sept. 1, 2014) (transferring an action to Arizona, where the forum selection clause included permissive language designating an Arizona forum, plus an express waiver of venue objections). Others have concluded that where a clause contains permissive language identifying a forum, an express waiver of venue objections precludes such objections from being asserted when suit is filed in the identified non-exclusive forum. <u>See, e.g.</u>, <u>Gennock v. Lucas Energy, Inc.</u>, No. 1:11-cv-982 AWI SMS, 2011 WL 4738320 at *5 (E.D. Cal., Oct. 5, 2011) (concluding that permissive language selecting Nevada as a forum did not preclude suit from being file elsewhere, but that an express waiver of venue objections meant that such objections could not be made if a suit is filed in Nevada); <u>Browsercam, Inc. v. Gomez, Inc.</u>, No. C08-02959 WHA, 2008 WL 4408053 at *2 (N.D. Cal., Sept. 26, 2008) (concluding that the forum selection clause permitted, but did not require, suit to be filed in New York, but that the express waiver of the right to object to venue applied if a lawsuit was brought in a New York court.).

19

Applying these principles here, this court agrees that the Power Purchase Agreement's forum selection clause permits, but does not mandate, that suit be filed in a San Jose, California court. Nevertheless, TCC having chosen to sue here, the express waiver precludes objections based on venue or inconvenient forum---in effect, rendering the clause mandatory with respect to this action. Accordingly, the court agrees with TCC that the modified Atlantic Marine analysis applies and thus, private-interest factors are deemed to weigh entirely in favor of the present forum, and the court considers only the public interest factors. Atlantic Marine, 134 S. Ct. at 582.

**C.** **Whether this case should be transferred to New Jersey**

There are five public interest factors to be considered: "(1) the local interest in the lawsuit, (2) the court's familiarity with the governing law, (3) the burden on local courts and juries, (4) congestion in the court, and (5) the costs of resolving a dispute unrelated to a particular forum." Boston Telecommunications, 588 F.3d 1201, 1211 (9th Cir. 2009) (citation omitted).

**a.** **Local interest in the lawsuit**

TCC plausibly asserts that California has an interest in having a local business's claim decided here. Defendants reiterate arguments that certain underlying events took place in New Jersey. But, for this factor, the court "ask[s] only if there is an identifiable local interest in the controversy, not whether another forum also has an interest." Boston Telecommunications, 588 F.3d at 1211. Accordingly, this factor weighs against transfer.

**b.** **Court's familiarity with the law**

The Power Purchase Agreement and Guaranty provide that California law governs. Defendants point out that basic contract law elements are the same in California and New Jersey; and, this court finds that New Jersey courts are capable of applying California law. However, as TCC argues, this court undoubtedly is more familiar with California law. Moreover, as discussed above, the parties agreed to the governing law provisions in the contracts between them. This factor weighs against transfer.

**c.** **Burden on local courts and juries**

Neither side has made any showing here. This factor is neutral.

### d. Court congestion

Neither side has made any showing here. This factor is neutral.

### e. Costs of resolving a dispute unrelated to a particular forum

Neither side has made any showing here. This factor is neutral.

### f. TCC's choice of forum

As the plaintiff in this action, TCC's choice of forum is given deference. And, indeed, for all the reasons discussed above, TCC's decision to sue here coincides with the preselected forum, as to which no objections based on venue or inconvenient forum may be made.

In any event, defendants have not made a sufficiently strong showing of inconvenience to overcome TCC's choice. Decker Coal Co., 805 F.2d at 843. They argue that TCC's choice should receive minimal consideration, pointing out that they negotiated and signed the subject agreements in New Jersey. But, as discussed above, the parties' contracts were also negotiated and executed in California by TCC. Defendants note that TCC's communications (i.e., the demand letters and the letter advising that it had retained counsel to pursue collection efforts) were directed to defendants in New Jersey. But, defendants have not explained why that fact makes California any more inconvenient for defendants than New Jersey is for plaintiff.

That leaves defendants' argument that the court should consider the Green Life Solar Installation Contract, which contains a forum selection clause designating New Jersey as the place for dispute resolution. Defendants essentially argue that the Installation Contract's forum selection clause should be given precedence over the Power Purchase Agreement's forum selection clause because the Installation Contract concerned the "main" solar project, whereas the Power Purchase Agreement pertains to the project's funding. They contend that the Power Purchase Agreement was "subsumed" within the Installation Contract because (1) the Church's obligations under the Installation Contract were conditioned on obtaining financing with TCC through the Power Purchase Agreement; and (2) the Power Purchase Agreement, in turn, requires the Church to "cause the [solar power system] to be designed, engineered, installed and constructed in accordance with the terms of the Installation Contract." (Shinn Decl., Ex. B at 1; Ex. C at ¶ 2.1).

21

Based on the record and arguments presented, defendants fail to convince. Although certain factors suggest that the Installation Contract and Power Purchase Agreement are intertwined, defendants have not cited authority addressing the circumstances presented here--- where one side seeks to enforce a forum selection clause in a contract (not at issue) against a non-signatory who seeks to enforce a competing forum selection clause in a different contract that is at issue. For that reason, defendants' citation to Medina v. OANDA Corp., No. 5:16-cv-02170 EJD, 2017 WL 1159572 (N.D. Cal., Mar. 29, 2017) is unpersuasive. In Medina, the court concluded that a forum selection clause in a customer contract between the parties applied to their dispute over plaintiff's account (even though the plaintiff was not suing on that agreement), because that contract contained a clause that broadly covered not only proceedings that arose "directly or indirectly under the Agreement," but also those that arose "in connection with the transactions contemplated by this Agreement." Id. at *10. That does not fit the situation here.

Because the majority of public interest factors weighs against transfer, with others being neutral, the court concludes that defendants' motion for transfer should be denied.

## ORDER

Based on the foregoing, the court denies defendants' Fed. R. Civ. P. 12(b)(3) motion to dismiss is denied (as well as their request for transfer under 28 U.S.C. § 1406(a)), as well as their alternate motion under 28 U.S.C. § 1404(a) to transfer this action to New Jersey.

SO ORDERED.

Dated: April 18, 2018

_____
HOWARD R. LLOYD
United States Magistrate Judge